GEORGIA STATE CONFERENCE OF the NAACP, et al., Plaintiffs,

v.

FAYETTE COUNTY BOARD OF COMMISSIONERS, et al., Defendants.

Civil Action No. 3:11–cv–123–TCB.

United States District Court, N.D. Georgia, Newnan Division.

July 3, 2013.

Leah C. Aden, Natasha Korgaonkar, Ryan P. Haygood, NAACP Legal Defense and Education Fund, Inc., New York, NY, Neil T. Bradley, Law Office of Neil Bradley, Avondale Estates, GA, for Plaintiffs.

Anne Ware Lewis, Bryan P. Tyson, Frank B. Strickland, Strickland Brockington Lewis, LLP, Atlanta, GA, Phillip L. Hartley, Harben, Hartley & Hawkins, LLP, Gainesville, GA, for Defendants.

## *ORDER*

TIMOTHY C. BATTEN, SR., District Judge.

On May 21, 2013, the Court entered an order granting Plaintiffs summary judgment on their claim of vote dilution under § 2 of the Voting Rights Act and denying

the County Defendants' motion for summary judgment. This case comes before the Court on the County Defendants' motion to certify an interlocutory appeal of four issues they have identified related to that order and to stay this case pending appeal [153].

## I. Legal Standard

■ Under 28 U.S.C. § 1292(b), a district court may grant leave to appeal an interlocutory order if it certifies that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." However, this process should be used sparingly. "The proper division of labor between the district courts and the court of appeals and the efficiency of judicial resolution of cases are protected by the final judgment rule, and are threatened by too expansive use of the § 1292(b) exception to it." *McFarlin v. Conseco Servs., LLC,* 381 F.3d 1251, 1259 (11th Cir.2004). Consequently, § 1292(b) should be used "only in exceptional cases where a decision of the appeal may avoid protracted and expensive litigation." *Id.* at 1256 (quoting 1958 U.S.C.C.A.N. 5255, 5260–61).

■ The term "question of law" does not encompass "the application of settled law to fact" or "any question the decision of which requires rooting through the record." *Id.* at 1258. Instead, the types of questions to which § 1292(b) is directed are those that "might be called [questions] of 'pure' law, matters the court of appeals 'can decide quickly and cleanly without having to study the record.'" *Id.* (quoting *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.,* 219 F.3d 674 (7th Cir.2000)).

■ A question of law is considered "controlling" if it "has the potential of substantially accelerating disposition of the litigation," even if it would not terminate the case. 19–203 GEORGE C. PRATT, MOORE'S FEDERAL PRACTICE-CIVIL § 203.31 (2012), *available at* Lexis MOORES. This "underscores the artificiality of attempting to identify a controlling question as an inquiry separate from the prediction whether appeal may materially advance the ultimate termination of the litigation." 16 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3930 (2d ed. 1996). Thus, the district court's primary consideration should be whether resolution of the question "would serve to avoid a trial or otherwise substantially shorten the litigation." *McFarlin,* 381 F.3d at 1259.

■ The requirement that there be substantial ground for difference of opinion is satisfied when (1) the issue is difficult and of first impression, (2) a difference of opinion as to the issue exists within the controlling circuit, or (3) the circuits are split on the issue. *United States ex rel. Powell v. Am. InterContinental Univ., Inc.,* 756 F.Supp.2d 1374, 1378–79 (N.D.Ga. 2010). However, the fact that the question is one of first impression, standing alone, is insufficient. *In re Flor,* 79 F.3d 281, 284 (2d Cir.1996). Instead, the district court has a duty "to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." *Id.* (quoting *Max Daetwyler Corp. v. Meyer,* 575 F.Supp. 280, 283 (E.D.Pa.1983)).

## II. Discussion

■ The County Defendants contend that this case involves four controlling questions of law:

(1) Whether the Court applied the correct standard in determining the Illustrative Plan was not a racial gerrymander;

(2) Whether a plaintiff must demonstrate that a plan offered to meet the first prong of *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), is not a racial gerrymander;

(3) Whether remedying a § 2 violation constitutes a compelling government interest sufficient to justify the use of the racially-gerrymandered plan that was used to demonstrate the § 2 violation; and

(4) Whether proof of the three *Gingles* factors plus one of the Senate factors (minority electoral success) is sufficient to establish a § 2 violation under *Nipper v. Smith,* 39 F.3d 1494, 1512–13 (11th Cir.1994).

As Plaintiffs argue, rather than identifying an issue upon which there is substantial ground for difference of opinion, the four alleged controlling questions the County Defendants assert to justify an interlocutory appeal are "manufactured, wholly inaccurate recitations of the Court's ruling, and/or have no relation to the Court's Order." Accordingly, the Court does not find that an interlocutory appeal is warranted.

The County Defendants first contend that the Court applied the wrong standard when determining whether the Illustrative Plan is a racial gerrymander. Specifically, the County Defendants argue that "this Court determined that because some traditional redistricting principles were used in developing the Illustrative Plan, race was not the predominant consideration." According to the County Defendants, pursuant to *Miller v. Johnson,* 515 U.S. 900, 917, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), *Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), and *Hunt v. Cromartie,* 526 U.S. 541, 548, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999), "the Court should have determined whether the boundaries of the plan were explained pre-dominantly by race or by adherence to those redistricting principles."

The problem with the County Defendants' first argument is their continued failure to acknowledge that this is a § 2 case—not an action brought under the Equal Protection Clause. The County Defendants continue to rely exclusively upon equal-protection precedent, ignoring § 2 cases. They repeatedly maintain that the Court should have applied *Miller* in its analysis of the first *Gingles* prong. Although they never come out and say it, the County Defendants' argument is essentially that the Court should have applied *Miller's* standard for compactness to determine whether the Illustrative Plan was compact under *Gingles,* which requires a § 2 plaintiff to show that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district.

However, the County Defendants' position is contrary to the Supreme Court's instruction in *League of United Latin American Citizens v. Perry,* 548 U.S. 399, 435, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) ("*LULAC*")—a case conspicuously absent from the County Defendants' briefs. As the Court explained in detail in its order, *LULAC* expressly holds that compactness under § 2 is distinct from compactness under equal protection:

"In the equal protection context, compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines." *LULAC,* 548 U.S. at 433, 126 S.Ct. 2594 (citing *Miller,* 515 U.S. at 916–17, 115 S.Ct. 2475). Section 2 compactness, by contrast, "refers to the compactness of the minority population, not to the compactness of the contested district." *Id.* (quoting *Bush v. Vera,* 517 U.S. at 997, 116 S.Ct. 1941 (Kennedy, J., concurring)); *see also Houston v. Lafay-*

*ette Cnty., Miss.,* 56 F.3d 606, 611 (5th Cir.1995) ("The district court should have focused on the size and *concentration* of the minority population, rather than only on the shape of the districts in the plaintiff residents' specific proposals."); *Dillard v. Baldwin Cnty. Bd. of Educ.,* 686 F.Supp. 1459, 1465 (M.D.Ala. 1988) ("By compactness, [*Gingles* ] does not mean that a proposed district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness.").

[152] at 30. The County Defendants make no effort to explain why this Court should apply the equal-protection compactness standard in this § 2 case when the Supreme Court has explicitly held that the § 2 compactness standard demands a different analysis.

As set forth in the Court's order, *LULAC* instructs that "while no precise rule has emerged governing § 2 compactness, the 'inquiry should take into account "traditional districting principles such as maintaining communities of interest and traditional boundaries."'" *LULAC,* 548 U.S. at 433, 126 S.Ct. 2594 (citing *Abrams v. Johnson,* 521 U.S. 74, 92, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997)). Eleventh Circuit precedent accords with *LULAC,* holding that a plan is compact where it is designed "consistent with traditional districting principles." *Davis v. Chiles,* 139 F.3d 1414, 1425 (11th Cir.1998). Applying that very standard, the Court held that Plaintiff's expert, William Cooper, took into account traditional redistricting principles, including "achieving a low population deviation, joining a community of interest, geographical compactness, and protecting incumbents." [152] at 42.

An additional problem with the County Defendants' argument is that although the Court held that Plaintiffs did not carry the burden of demonstrating that their proposed plan did not run afoul of *Miller,* out of an abundance of caution the Court determined that "although Cooper certainly took race into consideration when creating the Illustrative Plan, he did not do so at the expense of other redistricting principles," *id.,* and that "race was not Cooper's predominant consideration in designing the plan," *id.* at n. 21.

Moreover, despite the County Defendants' insistence that the Court failed to consider whether the shape of the district lines were explained predominantly by race, the Court specifically analyzed the shape of the district, finding that "the African–American population is dispersed throughout the northern half of the county, the cities of Fayetteville and Tyrone are separated by only 3.5 miles, and the two protrusions (one in Tyrone and one in Fayetteville) are linked together by much more than a mere narrow corridor of land" and are "geographically close to the area in with the African–American population is generally concentrated." *Id.* at 34–36. In other words, the Court rejected the County Defendants' argument that the unusual shape of District 5 of the Illustrative Plan rendered it non-compact.

The deficiencies in the County Defendants' arguments are highlighted by the fact that they fail to point to a single § 2 case applying the framework they proffer. Indeed, a substantial question is presented only where (1) the issue is difficult and of first impression; (2) a difference of opinion as to the issue exists within the controlling circuit; or (3) the circuits are split on the issue. *Powell,* 756 F.Supp.2d at 1378–79. Without identifying which ground applies, the County Defendants make the conclusory assertion that "[t]here is a substantial ground for a difference of opinion because of the lack of 'complete and unequivocal agreement' among the courts on these questions and, as this Court recognized,

the difficulty of determining Section 2 issues." Yet significantly, the County Defendants fail to point to any decision by any court applying their proffered framework. And while the Court acknowledged the difficulty of § 2 cases, it also explained—in depth—its reasoning and its application of Supreme Court and Eleventh Circuit precedent. Again, the County Defendants fail to explain, or point to any precedent showing, why the Court's application of *LULAC* is erroneous.

The County Defendants' second alleged issue—whether a plaintiff must demonstrate that a plan offered to meet the first prong of *Gingles* is not a racial gerrymander—fails for similar reasons. The County Defendants contend that the Court erroneously applied *Davis v. Chiles,* 139 F.3d 1414 (11th Cir.1998), to hold that Plaintiffs did not carry the burden of showing that the Illustrative Plan is not a racial gerrymander. This contention is meritless for several reasons.

To begin with, this "issue" is irrelevant in light of the Court's holding that the Illustrative Plan is not a racial gerrymander. Next, the County Defendants again fail to point to any authority supporting their position, i.e., they cite no cases holding that § 2 plaintiffs are required under the first prong of *Gingles* to show compliance with *Miller.* Additionally, regarding the Court's interpretation of *Davis,* contrary to the County Defendants' argument that *Davis* did not foreclose consideration of racial gerrymandering when evaluating whether a plaintiff meets the first *Gingles* prong, *Davis* does foreclose application of *Miller* in *this* case.[1]

In *Davis,* the court explained that *Miller* "analyzed bizarrely-drawn Congressional districts in which there was 'powerful evidence' that 'every [objective

districting] factor that could realistically be subordinated to racial tinkering in fact suffered that fate.' " *Id.* at 1425. The court differentiated *Miller* from *Gingles, Nipper v. Smith,* 39 F.3d 1494 (11th Cir.1994), and *Southern Christian Leadership Conference of Alabama v. Sessions,* 56 F.3d 1281 (11th Cir.1995) ("*SCLC*"), all of which "examined at-large voting districts that, at least on their face, did not reflect racial gerrymandering but instead were alleged to support racially polarized voting." *Id.* This case squarely falls into the *Gingles/Nipper/SCLC* line of cases—an at-large voting district that on its face does not reflect racial gerrymandering. Thus, just as in *Davis,* an "attempt to apply authorities such as *Miller* to this Section Two case, [ ] is unpersuasive, because the *Miller* and *Gingles/Nipper/SCLC* lines address very different contexts." *Id.*

Nonetheless, the County Defendants contend that *Nipper* requires the Court to apply *Miller* in analyzing the first *Gingles* prong. In *Nipper,* the Eleventh Circuit considered a claim of vote dilution in connection with the election of Florida judges. In analyzing the first *Gingles* prong, the court held that the "issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases;" the "inquiries into remedy and liability, therefore, cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system." *Nipper,* 39 F.3d at 1530–31. Explaining that a federal court may not "use its imagination to fashion a new system," the court found that based on the challenged system before it, "there

---

1. Again, despite the Court's holding to this effect, in its order the Court considered

whether race was Cooper's predominant consideration and concluded that it was not.

must be a remedy within the confines of the state's judicial model that does not undermine the administration of justice." *Id.* at 1531. The court then considered the relevant showing that the plaintiffs needed to make under the first prong of *Gingles* in challenging the judicial election scheme:

> In *Gingles*, the necessary showing was that the minority group was sufficiently large and geographically compact to constitute a majority in a single-member district; such a showing was logical because the plaintiffs were alleging vote dilution in a system of multimember legislative districts. In judicial cases, however, single-member districts may run counter to the state's judicial model. Thus, the question under the first *Gingles* threshold factor may not be whether the minority group could constitute a majority in a single-member district, but whether, within the state's judicial model, there exists an alternative election scheme that could serve as an appropriate section 2 remedy.

*Id.* The focus of the appropriate-remedy analysis, therefore, is whether the alternate scheme is a "workable remedy within the confines of the state's system of government." *Id.* at 1533 (citing *Holder v. Hall,* 512 U.S. 874, 884, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994)).

In *Brooks v. Miller,* 158 F.3d 1230, 1239 (11th Cir.1998), the Eleventh Circuit applied *Nipper* in the context of a challenge to Georgia's primary elections, holding that "[i]f the plaintiffs in a § 2 case cannot show the existence of an adequate alternative electoral system under which the minority group's rights will be protected, then the case ends on the first prerequisite." There, the plaintiffs' proffered plan of a pure-plurality system failed to pass

muster under the first *Gingles* prong because it was not a "workable regime." *Id.; accord Burton v. City of Belle Glade,* 178 F.3d 1175, 1199–1200 (11th Cir.1999) (rejecting plaintiffs' plans because court-ordered annexation and an injunction against future discrimination in annexation decisions were not "available remedies"). Here, because the challenged system is at-large voting, just as in *Gingles* the adequate alternative electoral system is simply single-member districting, which is a workable regime and an available remedy. The necessary showing in this case therefore is that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. As set forth in the Court's order, Plaintiffs have made that showing.

The County Defendants next contend that the Court's order raised the issue of whether remedying a § 2 violation constitutes a compelling government interest sufficient to justify the use of a racially-gerrymandered plan. As with the County Defendants' second issue, this alleged issue hinges on the assumption that the Illustrative Plan is in fact a racial gerrymander. However, such an assumption ignores the Court's express holdings that race was not the predominant consideration in designing the plan and that Cooper took into consideration other redistricting principles. Although the Court noted that "even if race had been Cooper's primary consideration, the Court finds that the Illustrative Plan would survive strict scrutiny because it does not 'subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability,'" that holding was not central to the Court's disposition of the case.[2] [152] at 42 n. 21. Thus, just as

---

2. Even if that conclusion were essential to the Court's ruling, the County Defendants fail to point to any authority that this issue—wheth-

er compliance with § 2 constitutes a compelling state interest—is one with respect to which there is a substantial ground for differ-

the Supreme Court did in *Vera*, 517 U.S. at 976–78, 116 S.Ct. 1941, the Court merely assumed without deciding that the need to remedy a § 2 violation is a compelling state interest. Because the Court did not apply strict scrutiny, the Eleventh Circuit need not consider the constitutional question raised by the County Defendants.[3]

Finally, the Court turns to the County Defendants' fourth stated issue: whether a plaintiff can succeed in a § 2 case merely by proving the three *Gingles* preconditions and one of the Senate factors. In their brief in support of their motion, the County Defendants argue that the "Eleventh Circuit in *Nipper* discussed the importance of reviewing all of the Senate factors, not just one additional factor beyond the three *Gingles* prongs." But in their reply brief in support of their motion, the County Defendants go even further, arguing that the Court applied an "abbreviated analysis"[4] in which it held that upon Plaintiffs' showing of the three *Gingles* preconditions[5] "the case is over," i.e., the Court did not require Plaintiffs to prove *any* of the Senate Factors. The Court is baffled by the County Defendants' contentions.

In its order, the Court devoted thirty-one pages to analyzing each of the Senate factors and expressly found that the following factors weighed in Plaintiffs' favor:

- *Past Discrimination and Lingering Effects:* "In sum, based on Georgia's long history of discrimination, the Court finds that this factor weighs in Plaintiffs' favor." [152] at 52.[6]

---

ence of opinion. Moreover, Eleventh Circuit precedent suggests that it has assumed that compliance with § 2 is indeed a compelling state interest. *See Clark v. Putnam Cnty.*, 293 F.3d 1261, 1273 (11th Cir.2002) (noting that "[a]lthough there is a 'significant state interest in eradicating the effects of past racial discrimination,'" there was no evidence of a need for remedial districting under the facts at issue) (quoting *Shaw v. Reno*, 509 U.S. 630, 656, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)); *Davis*, 139 F.3d at 1425 n. 23 ("a majority of the Supreme Court has assumed that the need to remedy a Section Two violation itself constitutes a compelling interest"); *Askew v. City of Rome*, 127 F.3d 1355, 1376 (11th Cir.1997) (affirming district court, which held that "eliminating violations of Section 2 is a compelling state interest"); *accord Dillard v. City of Greensboro*, 946 F.Supp. 946, 956 (M.D.Ala. 1996) ("In other words, with the exception of § 2's requirement of compactness, traditional race-neutral principles can be subordinated or even sacrificed in favor of race considerations to the extent necessary to remedy the § 2 violation.").

3. In a footnote in *Davis*, 139 F.3d at 1425 n. 23, the Eleventh Circuit pointed out that "*Gingles, Nipper,* and *SCLC* would not support the judicial imposition of an electoral district drawn solely (or predominantly) to reflect racial considerations absent a compelling interest," but that a "majority of the

Supreme Court has assumed that the need to remedy a Section Two violation itself constitutes a compelling interest." Significantly, the Court has not ordered the Illustrative Plan as a remedy, i.e., that plan has not been "judicially imposed."

4. The Court's eighty-one-page order is far from an "abbreviated" analysis. The only portions that are arguably abbreviated are the Court's discussions of the second and third *Gingles* prongs; this is only because the County Defendants conceded those prongs.

5. The County Defendants also offer the conclusory statement that the second and third *Gingles* preconditions "usually will be" met. However, defendants commonly challenge, and even defeat, § 2 claims by prevailing on the second and/or third *Gingles* preconditions. *See, e.g., Johnson v. Hamrick*, 296 F.3d 1065, 1078–81 (11th Cir.2002); *Burton*, 178 F.3d at 1201; *Brooks v. Miller*, 158 F.3d 1230, 1240–41 (11th Cir.1998); *City of Rome*, 127 F.3d at 1377–85; *SCLC*, 56 F.3d at 1292–94.

6. The County Defendants contend that based on the Court's holding—that this factor did not weigh heavily in support of Plaintiffs due to Plaintiffs' lack of evidence regarding past discrimination specific to Fayette County— this factor added no weight to the Court's analysis. This argument obviously overlooks

- *Racially Polarized Voting:* "While a vote dilution claim must fail '[w]hen the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens,' *LULAC v. Clements,* 999 F.2d 831, 850 (5th Cir.1993), because the County Defendants do not offer any evidence, or even analysis, in support of their contention that racial bloc voting could potentially be related to politics rather than race, the Court finds that this factor weighs in favor of Plaintiffs." *Id.* at 53–54.

- *Election Practices that Enhance Discrimination:* "Because Fayette County employs multiple devices in its BOE and BOC elections that enhance the potential for vote dilution, this factor weighs heavily in favor of Plaintiffs." *Id.* at 59.

- *Election of African–Americans:* "This factor, therefore, weighs strongly in favor of vote dilution." *Id.* at 69.

- *Responsiveness of Commissioners to African–Americans' Particularized Needs:* "More importantly, the evidence is that the BOC is not politically responsive to African–American voters." *Id.* at 74.

- *Other Factor:* "Thus, the BOC's method of appointing board and commission positions has the potential to affect African–Americans' participation in the political process in Fayette County." *Id.* at 78.

In reviewing all the factors, the Court pointed out that "it is undisputed that no African–American has ever been elected to the BOC or BOE and that voting in Fayette County is racially polarized in BOC and BOE elections." *Id.* at 79. Consequently, the Court held that "[b]ased on the heavy weight of those *two factors along with the other factors identified above that weigh in Plaintiffs' favor,*" the Plaintiffs had shown vote dilution.[7] *Id.* (emphasis added). Thus, the County Defendants' contention that the Court's decision turned upon Plaintiffs' showing of only one factor is an indefensible mischaracterization of the Court's order.

In their reply brief in support of their motion, the County Defendants acknowledge that the Court found additional factors weighing in Plaintiffs' favor, but make the absurd contention that those additional factors "are not relevant to the central question of whether racial bias in the community of Fayette County, when combined with the at-large system, leads to exclusion of minority voters." The United States Senate obviously felt differently because it specifically articulated those factors, which the County Defendants contend are irrelevant, as guiding considerations for Courts in determining the existence of vote dilution. While the Supreme Court has held that those additional factors are "supportive of, but *not essential to,* a minority voter's claim," *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752, they certainly are not irrelevant to Plaintiffs' claim, as the County Defendants maintain.

In light of the Court's clear identification of six factors that weighed in Plaintiffs' favor, the County Defendants' alleged issue of whether a § 2 plaintiff can prevail

the Court's holding that the history of past discrimination in Georgia added weight to a finding of vote dilution.

**7.** Also perplexing is the County Defendants' contention that "Plaintiffs dispute that the

Court specifically gave 'heavy weight' to the two factors of racial polarization and minority electoral success." The Court explicitly stated that it gave heavy weight to those factors, and Plaintiffs in no way disputed that holding.

by showing only the *Gingles* preconditions and one Senate factor is irrelevant to the issues in this case.

In sum, the County Defendants have failed to identify any issue within the Court's order on which there is substantial ground for difference of opinion. As a result, the Court will not certify any of those issues for interlocutory appeal, and the Court need not address the County Defendants' arguments as to whether such an appeal would materially advance the ultimate termination of the litigation.

## III. Conclusion

For these reasons, the County Defendants' motion to certify the Court's May 21 order for an interlocutory appeal [153] is DENIED.