United States Court of Appeals,

Eleventh Circuit.

No. 96-9284.

Tyrone BROOKS, Lanett Stanley, et al., Plaintiffs-Appellants,

v.

Zell MILLER, Governor of Georgia, Georgia State Board of Elections, et al., Defendants-Appellees.

Oct. 30, 1998.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:90-CV-1001-RCF), Richard C. Freeman, Judge.

Before DUBINA and MARCUS, Circuit Judges, and PROPST[*], Senior District Judge.

DUBINA, Circuit Judge:

In this voting rights action, Plaintiffs, 27 black Georgia residents and voters, challenge the majority vote requirement for primary elections in Georgia, set forth in O.C.G.A. § 21-2-501. The complaint was certified as a class action on behalf of all present and future black registered voters in Georgia. Plaintiffs contend that the majority vote requirement, also known as the primary runoff requirement, violates § 2 of the Voting Rights Act, 42 U.S.C. § 1973, as well as the First, Fourteenth, and Fifteenth Amendments to the United States Constitution. After a bench trial, the district court ruled that Georgia's majority vote provision for primary elections is constitutional and does not violate § 2.

I. FACTS

---

[*]Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

O.C.G.A. § 21-2-501 originally required that a candidate in a primary or general election receive a majority of the votes cast in order to be nominated or elected and provided for a runoff election in the event that no candidate received a majority. In 1994, after the filing of this action, Georgia's General Assembly repealed the majority vote requirement for all general elections, except those for certain constitutional offices not at issue here, and replaced it with a 45 percent plurality rule. *See* O.C.G.A. § 21-2-501(b), as amended by Ga. L.1994, p. 279, § 11; O.C.G.A. § 21-2-2(18.1) (defining plurality as 45 percent of the total votes). In this action, Plaintiffs do not challenge the 45 percent plurality rule for general elections or majority voting as it affects multi-member offices such as school boards and county commissions. What Plaintiffs do challenge is the majority vote requirement for primary elections for single member, county-level offices, members of the General Assembly, superior court judges and district attorneys, and judges and justices of the Georgia Court of Appeals and Georgia Supreme Court.[1]

In 1990, after conducting a five-day hearing on Plaintiffs' motion for preliminary injunctive relief, the district court denied the Plaintiffs' motion. Shortly thereafter, the United States Department of Justice filed a parallel case which was consolidated with this action. Before trial, the United States filed a motion to voluntarily dismiss its complaint which the district court granted.

The district court made extensive findings of fact in this case. The district court relied on testimony presented at the four-day bench trial in 1996 and testimony presented at the hearing held

---

[1]Georgia is one of nine states with a majority vote requirement for primary elections. *See* Ala.Code § 17-16-36 (1995); Ark.Code Ann. § 7-7-102 (Michie 1993); Fla. Stat. Ann. § 100.061 (West 1982); O.C.G.A. § 21-2-501 (1993 & Supp.1997); La.Rev.Stat. Ann. § 18:511 (West 1979 & Supp.1998); Miss.Code Ann. 23-15-191 (1990); Okla. Stat. Ann. tit. 26, § 1-103 (West 1991); S.C.Code Ann. § 7-17-600 (Law.Co-op.1977); Tex. Elec.Code Ann. § 172.003 (West 1986).

in 1990 on Plaintiffs' motion for preliminary injunctive relief, along with other exhibits and reports submitted by the parties. In order to resolve the Plaintiffs' claims, the district court focused its findings of fact on two key areas. First, the district court examined evidence relating to the process by which the majority vote provision was enacted into law to determine whether it was passed for a racially discriminatory purpose. Second, the district court considered evidence presented on the issue of whether the majority vote law has a discriminatory impact. The following is a summary of the district court's factual findings.

A. *Discriminatory Purpose*

The district court acknowledged Georgia's long history of racial discrimination at all levels of government. The voting strength of blacks has historically been diminished in Georgia in numerous ways, including property ownership requirements, literacy tests, and the use of the county unit system which undermined the voting power of counties with large black populations. The county unit system gave each county twice as many unit votes for the purpose of nominating candidates for statewide office as the county had representatives in the Georgia House. This system had the effect of increasing the voting power of rural counties and diluting that of urban areas. In 1962, a three-judge federal panel struck down Georgia's county unit system as unconstitutional. *See Sanders v. Gray,* 203 F.Supp. 158 (N.D.Ga.1962).

The majority vote provision at issue in this case was enacted as part of a sweeping election reform bill signed into law in 1964 by then-Governor Carl E. Sanders ("Governor Sanders" or "Sanders"). This law was Georgia's first election code. Prior to 1964, Georgia's election system was chaotic. The rules for primary and general elections varied from county to county and election to election. Corruption and manipulation were commonplace. Throughout the state, and particularly

3

in rural counties, groups known as "courthouse crowds" controlled local elections and often manipulated election practices to maintain their own power. Georgia was essentially a one-party state, and a victory in a Democratic primary was tantamount to election.

One form of election manipulation used under the plurality system consisted of entering a "stalking horse" into a local race to split the opposition vote and assure victory to courthouse crowd candidates. Governor Sanders experienced this tactic first hand when he ran against Peter Zack Geer in the 1962 lieutenant governor's race. Sanders withdrew from the race after hearing that Geer planned to enter a candidate named Carl F. Sanders in the race to confuse voters and ensure his own victory. Sanders ran for governor instead and won.

When the Georgia legislature created the first Election Laws Study Committee ("ELSC") in 1957 to examine election practices and propose legislation, members of this committee were interested in maintaining the discriminatory status quo through measures such as literacy tests. The first ELSC did not produce any comprehensive election reform. A second ELSC was formed in 1961 but dissolved without taking any action.

In 1963, after the county unit system had been struck down as unconstitutional, Denmark Groover ("Groover"), a state representative known for his staunch segregationist views, attempted to pass a majority vote requirement. There is no doubt that Groover's majority vote bill was the product of racial animus. He opposed "bloc voting," a euphemism for black citizens voting in a bloc. Groover's bill passed in the House but died in committee in the Georgia Senate.

Governor Sanders called for the creation of a third ELSC in 1963 for the purpose of drafting an election code. There were more racially moderate members on this committee than on the previous ELSCs. The third ELSC recommended a majority vote requirement, in addition to

4

numerous other measures, as part of a comprehensive election code. The General Assembly adopted most of these recommendations, including the majority vote requirement. The ELSC's recommendations included some discriminatory measures such as a scaled-down version of a literacy test. However, some of the proposals of the third ELSC were either not related to race or promoted increased black participation in elections. For example, the 1964 code required that a voting registrar be present at the county courthouse during all business hours and that voter registration remain open until 50 days before an election.

Many supporters of the 1964 election code's majority vote requirement had legitimate "good government" motives. These backers wanted to reduce the power of the courthouse crowds and to eliminate the use of stalking horses and dummy candidates as a method of election manipulation. Governor Sanders was one of the key supporters of the measure. In the context of Georgia politics in the early 1960's, Sanders was regarded as a moderate on racial issues. He opposed the civil rights movement, yet he was not a militant segregationist. Sanders had considerable power over the General Assembly, enabling him to influence the agenda of the legislature. His power in the legislature was so great that he was able to install his friend and supporter, George T. Smith ("Smith"), as Speaker of the House.

Plaintiffs emphasize the racial antipathy of Groover and attempt to impute the improper motivations behind his proposal of the majority vote in 1963 to the supporters of the 1964 code's majority vote requirement. The district court found that Groover's racist motives were not attributable to the supporters of the 1964 law. Groover supported Sanders' opponent in the governor's race and was not involved in the Sanders administration. He was not a member of the third ELSC, and he had no influence over that committee.

5

The district court also acknowledged that Sanders favored at-large elections in 1962, when he was president *pro tem* of the Senate, for racially discriminatory reasons as well as some sound government reasons. Again, the district court chose not to impute those discriminatory motives to Sanders's support of the majority vote law in 1964 in the absence of evidence indicating that the 1964 majority vote provision itself was racially motivated.

B. *Discriminatory Impact*

On the question of the effect of the majority vote law, the district court considered testimony as to the law's impact on individuals considering a run for office as well as statistical analyses of data showing how the law affected actual elections. The district court found that though there was some evidence minimally supporting the theory that black candidates were discouraged from running for office by the prospect of a runoff, the evidence did not enable the court to ascertain how pervasive any deterrent effect had been. In other words, the Plaintiffs failed to prove that the majority vote law improperly discourages potential black candidates. In addition, there was no proof that the law would act as a greater deterrent for black candidates than for white candidates.

Defendants' expert witness supervised the compilation of a database containing information on the effect of the majority vote requirement on Georgia primary elections from 1970 to 1995. During this period, there were a total of 2,798 runoff sequences, and complete data was available for 2,773 of these. Over 90 percent of these runoffs were in Democratic party primaries. Of these 2,773 runoff sequences, there were 278 which involved a black candidate and a white candidate in both the primary election and the runoff. In 85 of the runoffs between a black candidate and a white candidate, the candidate who won a plurality of votes in the initial primary election lost in the runoff. The district court described these 85 runoff elections as "flip" sequences.

6

In 56 of the flip sequences, the black candidate lost the runoff after receiving a plurality of the votes in the initial primary. In 29 of the flip elections, the white candidate lost the runoff after receiving a plurality of the votes in the initial primary. Thus, the majority vote requirement for primary elections yielded a net result of 27 fewer black candidates than would have been nominated under a pure plurality scheme.[2]

Most of the 27 flip elections adverse to black candidates occurred at the county and local levels. A net loss of 30 black candidates in local and county elections resulted from the majority vote requirement. In state legislature and superior court elections, the primary runoff requirement resulted in a net gain of three black candidates. In state-wide and federal primaries, the net results would have been the same under a plurality scheme as they were under the majority vote requirement.

The district court found that the disparity in outcomes in primary runoff elections was attributable to the relative strength of individual candidates and not to any alleged discriminatory impact of the majority vote requirement. The Defendants' political science expert presented a theory under which a candidate who receives 40 percent or more of the votes in the initial election and who leads his or her opponent by at least five percent is considered a "strong leader." In other words, a "strong leader" is a candidate who soundly wins an election. Runoff winners were overwhelmingly "strong leaders" in their initial primary races. The runoff winners averaged above 40 percent of the initial vote and generally led their nearest opponent by 10 to 12 percentage points. Black "strong leaders" defeated white opponents in runoffs 71 percent of the time. The black candidates who lost

---

[2]Significantly, it does not follow that Georgia would have had 27 additional black office holders because a victory in a primary election does not ensure a win in the general election.

in runoffs typically entered the runoff elections in a much weaker position. The district court concluded that black leaders who lost runoffs were on average weaker candidates than black or white leaders who won runoff elections. On the question of racial polarization, the district court found that the Plaintiffs failed to prove that voting in Georgia was racially polarized.

The district court concluded that, overall, Plaintiffs failed to demonstrate that the majority vote requirement in primary elections had a significant adverse effect on black voters and candidates.

## II. STANDARD OF REVIEW

The issue of whether an election system was established or maintained for a discriminatory purpose is a question of fact subject to the clearly erroneous standard of review. *Rogers v. Lodge,* 458 U.S. 613, 622-23, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Rule 52(a) of the Federal Rules of Civil Procedure is particularly relevant to our review of the district court's findings on purpose. Rule 52(a) requires that in reviewing the district court's factual findings, we must give due regard to the court's opportunity to judge the credibility of witnesses. Fed.R.Civ.P. 52(a).

We review the district court's determination of whether the majority vote requirement has had a discriminatory impact for clear error. *Thornburg v. Gingles,* 478 U.S. 30, 79, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (stating that "application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law"). Thus, while we review the district court's conclusions of law *de novo, Davis v. Chiles,* 139 F.3d 1414, 1420 (11th Cir.1998), the Supreme Court has clarified that the clearly erroneous standard applies to the district court's ultimate conclusion as to whether an election mechanism leads to discriminatory results. *Gingles,* 478 U.S.

at 79, 106 S.Ct. 2752. The trial court "is to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open" to minorities. *Id.* (citations and quotations omitted). In conducting our review of the district court's decision, we have the "power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Id.* (citations omitted).

### III. ANALYSIS OF FACTUAL FINDINGS

A. *Discriminatory Purpose*

The district court found that the majority vote requirement was not passed for a discriminatory purpose and that the key supporters of the requirement had good government reasons for their support. There is adequate support in the record for this finding, and we hold that it was not clearly erroneous. The district court credited the testimony of Governor Sanders who explained that prior to the passage of the 1964 election code, Georgia elections were "in a state of chaos." (1st Supp. R., vol.4, 167). Some counties used a plurality system, while others had a majority vote requirement. *Id.* Election fraud was pervasive throughout the state, including the use of "stalking horses" in elections where only a plurality was required for victory. *Id.* at 167-69. In addition, according to Governor Sanders, incumbents frequently attempted to "muddy the water" by getting as many people as possible to run in their races to dilute the opposition vote and win a plurality. *Id.* at 170.

The district court also credited the testimony of other witnesses to the effect that the majority vote requirement was not motivated by an intent to discriminate on the basis of race. Eugene Patterson, an anti-segregationist who was editor of *The Atlanta Constitution* in the early sixties

9

testified that Sanders was not racist in his attitudes and that the 1964 code, including the majority vote provision, was passed for legitimate government reasons and not to discriminate against black voters and candidates. (R., vol.15, 447-49). George T. Smith, Speaker of the House during the Sanders administration, testified that there was no discussion of discrimination against black candidates in connection with the Sanders administration's support for majority voting. (1st Supp. R., vol.5, 77). Melba Williams, a member of the third ELSC, whom no one suggests was racially motivated in her support for majority voting, testified that the committee's decision to include a majority voting provision in the ELSC's proposed code had nothing to do with race. (1st Supp. R., vol.5, 137-40).

Plaintiffs contend that the district court clearly erred in failing to impute the discriminatory motives behind Groover's 1963 majority vote bill to the supporters of the 1964 election code's majority vote provision. However, Governor Sanders testified that Groover, who had supported his opponent in the governor's race, had "nothing to do with" the comprehensive 1964 election reform law. (1st Supp. R., vol.4, 195). This testimony as to Groover's lack of input in the 1964 bill was corroborated by Smith. (1st Supp. R., vol.5, 74-77). It appears that Plaintiffs' emphasis on the discriminatory intent of Groover in connection with majority voting is necessitated by the lack of evidence that the proponents of the 1964 election code had racially discriminatory motives for their support of the majority vote provision. One of the Plaintiffs' experts admitted on cross examination that in his review of all of the records of the third ELSC that produced the 1964 election code, he did not find any evidence of a "smoking gun," meaning evidence providing a clear link between the majority vote provision in that code and race discrimination. (R., vol.14, p. 187). The Plaintiffs' theory was that a discriminatory purpose behind the 1964 provision could be inferred

10

circumstantially from the improper motives behind Groover's previous majority vote bill, from the third ELSC's proposal of a modified literacy test, and from evidence that Sanders' support of previous measures, such as at-large voting, was racially motivated. The district court did not commit clear error by rejecting this theory and focusing instead on specific evidence concerning how and why the majority vote rule was included in the 1964 election code.

B. *Discriminatory Impact*

With respect to Plaintiffs' allegation that the challenged provision discouraged blacks from running for office, the district court heard testimony from three witnesses who had held office in Georgia, including Plaintiff Tyrone Brooks, a state legislator from Atlanta. These witnesses testified to the effect that the majority vote law was a deterrent for many potential black candidates. Although two of these witnesses gave a few specific examples of black individuals they had talked to who said that they were discouraged by the prospect of a primary runoff, the district court found that this evidence gave only minimal support for the theory that black candidates were deterred by the possibility of a runoff before entering an election. This evidence did nothing to bolster the theory that the potential for a runoff was more of a deterrent for black candidates than for white candidates.

On the question of whether the Plaintiffs proved that the majority vote requirement had a significant, adverse effect on black candidates, the district court found that the racial impact of the majority vote requirement has been negligible at most. The court considered the fact that the requirement caused a net loss of 27 black nominees over 25 years and that there was no negative impact on black candidates in roughly 99 percent of all runoffs during this period. The district

court's finding that the majority vote law does not have a discriminatory effect on black candidates has strong support in the record and therefore is not clearly erroneous.

## IV. LEGAL ANALYSIS

A. *Section 2 of the Voting Rights Act*

With respect to the Plaintiffs' claim under § 2 of the Voting Rights Act, 42 U.S.C. § 1973, the district court concluded that Georgia's majority vote requirement for primary elections does not violate § 2.

1. *Discriminatory Purpose*

Plaintiffs argue that a showing of discriminatory purpose alone is sufficient for a violation of § 2. The Plaintiffs' claim under this theory fails for two reasons. First, as discussed above, we affirm the district court's factual finding that the majority vote requirement contained in the 1964 election code was not motivated by a discriminatory purpose. Second, even if we found clear error in the district court's finding on discriminatory purpose, we are bound by *Johnson v. DeSoto County Bd. of Comm'rs,* 72 F.3d 1556 (11th Cir.1996), which held that discriminatory intent alone, in the absence of a showing of discriminatory effect, is insufficient to establish a violation of § 2. *Id.* at 1561. We will, therefore, focus our discussion on the "results test" for § 2 violations.

2. *Discriminatory Results*

Congress amended § 2 in 1982 to clarify that a violation of this statute may be proved by a showing of discriminatory results alone, thereby superceding *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490 (1980), which held that a plaintiff had to show both a discriminatory purpose and a discriminatory effect to establish a violation. Section 2, as amended, provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a

12

denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973. The Senate Judiciary Committee Majority Report accompanying the 1982 amendment listed a number of factors that may show a § 2 violation.[3]

---

[3]The "typical factors" listed in the Senate Report are as follows:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> 6. whether political campaigns have been characterized by overt or subtle racial appeals;[and]

Though the test for § 2 violations is generally flexible and fact-intensive, the Senate Report placed three limits on the way § 2 violations may be proved. *Gingles,* 478 U.S. at 46, 106 S.Ct. 2752. First, electoral devices such as at-large elections, or in this case, a majority vote requirement, do not violate § 2 per se. *See id.* Those challenging an electoral device must prove that under the totality of the circumstance, the device "result[s] in unequal access to the electoral process." *Id.* Second, a violation of § 2 cannot be established by showing "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone." *Id.* Finally, plaintiffs must prove the existence of racial bloc voting. *Id.* The results test does not assume it. *Id.*

### a. Applicability of the *Gingles* prerequisites

The *Gingles* case involved a vote dilution claim against the use of multi-member districts. In this context, the Supreme Court developed three prerequisites for a claim of vote dilution. *Gingles,* 478 U.S. at 50, 106 S.Ct. 2752. The Supreme Court has not heard any challenges to

---

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

　　Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

　　whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [and]

　　whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 97-417, 97th Cong. 2nd Sess. 28, 28-29 (1982), U.S.Code Cong. & Admin.News 1982, pp. 206-207. The Senate Committee clarified that " "there is no requirement that any particular number of factors be shown, or that a majority of them point one way or the other.' " *Gingles,* 478 U.S. at 45, 106 S.Ct. 2752 (quoting S.Rep. No. 97-417 at 29).

majority vote requirements, though such challenges have been presented in lower federal courts.[4]

Because the requirement of a majority of the votes in a primary election is distinct from the establishment of a multi-member district such as that at issue in the *Gingles* case, Georgia's majority vote provision does not fit neatly into the analytical framework set out in *Gingles. See Whitfield,* 686 F.Supp. at 1374-75 (stating that it "is doubtful" that the *Gingles* prerequisites would be emphasized in a challenge to a runoff requirement).

Nonetheless, we agree with the district court that, with slight modification, the three prerequisites for the results test set out in *Gingles* are applicable to this case. *Gingles* calls for a flexible, fact-intensive inquiry into whether an electoral mechanism results in the dilution of minority votes, and the Court in *Gingles* recognized the "potentially dilutive" effect of majority vote requirements. *See* 478 U.S. at 46, 56, 106 S.Ct. 2752.

## b. Analysis under *Gingles*

The Court in *Gingles* developed the following three threshold requirements for establishing a violation of § 2:(1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "the minority group must be able to show that it is politically cohesive;" and (3) "the minority group must be able to

---

[4]In *Whitfield v. Democratic Party of the State of Arkansas,* 686 F.Supp. 1365 (E.D.Ark.1988), *aff'd by equally divided court without opinion,* 902 F.2d 15 (8th Cir.1990) (en banc), a district court held that Arkansas' majority vote requirement for primary elections did not violate § 2 of the Voting Rights or the Fourteenth and Fifteenth Amendments to the United States Constitution. In another challenge, a three-judge panel held that Arkansas' majority vote provision for general elections was unconstitutional, but rejected the constitutional attack on the majority vote requirement as applied to primary elections. *Jeffers v. Clinton,* 740 F.Supp. 585, 594-95 (E.D.Ark.1990) (reasoning that the primary runoff represents a legitimate means to ensure that the nominee has a majority of party support and that a runoff is not necessary in a general election because there are almost never more than two substantial candidates).

15

demonstrate that the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 50, 106 S.Ct. 2752. These three circumstances are "necessary preconditions" for a showing that an electoral scheme impaired minority voters' ability to elect their chosen representatives. *Id.* Once plaintiffs establish the three prerequisites, they must go on to show that, under the totality of the circumstances, they have been denied an equal opportunity to elect representatives of their choice. *Nipper v. Smith,* 39 F.3d 1494, 1512 (11th Cir.1994).

### i. The first *Gingles* prerequisite

The first prerequisite essentially "asks whether the court can fashion a remedy for a demonstrated abridgement." *Nipper,* 39 F.3d at 1511. If the plaintiffs in a § 2 case cannot show the existence of an adequate alternative electoral system under which the minority group's rights will be protected, then the case ends on the first prerequisite. *See id.* at 1511 n. 34. In its analysis under the first prerequisite, the district court determined that "[t]he analogous question in the case at bar is whether black voting strength would be "less diluted' under some workable regime other than a strict majority vote requirement." (R., vol. 12, Tab 165, 22). This is a proper interpretation of the first *Gingles* prerequisite as applied to Georgia's majority vote provision.

The district court found that the Plaintiffs failed to establish the first *Gingles* prerequisite because they did not prove that any alternative to the majority vote requirement would result in a net increase of black elected officials. Under a 45 percent plurality rule, like that in place in Georgia's general elections, there would have been a net *loss* of one black primary winner between 1970 and 1995. Although the evidence demonstrated that under a pure plurality system in Georgia primaries, there would have been a net increase of 27 black nominees for political office during the

16

same period, "[i]n assessing a plaintiff's proposed remedy, a court must look to the totality of the circumstances, weighing both the state's interest in maintaining its election system and the plaintiff's interest in the adoption of his suggested remedial plan." *Davis v. Chiles,* 139 F.3d 1414, 1419-20 (11th Cir.1998) (citing *Houston Lawyers' Ass'n v. Attorney Gen'l of Tex.,* 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991)).  As Defendants pointed out, a pure plurality system such as that suggested by Plaintiffs could theoretically result in a candidate's winning with 1% of the vote if enough candidates entered the race.  Obviously, this type of result would seriously undermine the legitimacy of the government, and the state has a substantially compelling interest in preventing this from occurring.  Particularly when balanced against the average of only one additional nominee per year statewide over the past twenty-five years that would have resulted from a pure plurality system, the district court could properly conclude that the harm resulting from Plaintiffs' proposed remedy is simply too great to justify ordering such a system.  Accordingly we hold that the district court did not err in concluding that Plaintiffs failed to establish an adequate remedy.  Because Plaintiffs fail on the first prerequisite, the case under § 2 could end here.  *Nipper,* 39 F.3d at 1511 n. 34. Nevertheless, we will review the remainder of the district court's § 2 analysis.

ii. The second and third *Gingles* prerequisites

The district court dealt with the second and third *Gingles* factors together, concluding that the Plaintiffs failed to meet either requirement.  The second prerequisite requires a showing that the minority group is politically cohesive, while the third calls for proof of majority white bloc voting sufficient to defeat the minority's preferred candidates.  *Gingles,* 478 U.S. at 50, 106 S.Ct. 2752. In other words, these prerequisites ask whether voting is racially polarized and, if so, whether the white majority is usually able to defeat the minority bloc's candidates.  In the absence of minority

17

political cohesion and significant white bloc voting, it would be difficult, if not impossible, to prove dilution of minority votes in violation of § 2. *See Nipper,* 39 F.3d at 1533.

The district court, while acknowledging Georgia's notorious history of official discrimination against black voters as well as the possibility "that racially polarized voting is the norm in Georgia," found that the Plaintiffs failed to carry their burden of proof on the question of racial polarization. (R., vol. 12, Tab 165, 23). The district court went on to state that even if the Plaintiffs had proven racially polarized voting, they failed to show that the purported white voting bloc "usually" defeated the purported minority bloc's candidates under the majority vote system. *Id.* at 24.

In discussing the proper legal standard for analysis of racial polarization, the *Gingles* Court explained that "in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover' votes rises to the level of legally significant white bloc voting." 478 U.S. at 56, 106 S.Ct. 2752. We agree with the district court that the statistical evidence offered by the Plaintiffs did not support the proposition that the white voting bloc normally defeated the candidate supported by most black voters. Runoffs caused by Georgia's majority vote law occur in only a small fraction of all primaries in the state. Thus, even if there were a significant racial impact in the context of all runoffs, it could not be said that the white majority usually defeats the minority's preferred candidate under Georgia's primary runoff system. Moreover, the majority vote law had no net adverse racial impact on black candidates in roughly 99 percent of all runoffs over a 25 year period. We therefore affirm the district court's conclusion that Plaintiffs failed to prove that white bloc voting "usually" leads to the defeat of black voters' preferred candidates under the majority vote scheme.

18

Plaintiffs criticize the district court's analysis under the second and third *Gingles* factors as containing "an extraordinary inconsistency." (Plaintiffs' brief at 36.) The alleged inconsistency lies in the following passage of the district court's order:

> Rather than demonstrating to the court that black primary winners would be capable of winning general elections, plaintiffs have made every effort to convince the court that voting in Georgia is so polarized that racial minorities cannot win in majority white districts. Accepting their arguments as true, a plurality primary system would not increase "the potential [of blacks] to elect representatives in the absence of the challenged structure."

(R., vol. 12, Tab. 165, 23 (quoting *Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. 2752)). The district court did make a factual finding that the Plaintiffs failed to prove racially polarized voting. We do not, however, agree with the Plaintiffs that the district court's reasoning was logically flawed merely because it assumed, *arguendo,* that voting was as racially polarized as the Plaintiffs attempted to demonstrate for purposes of the second and third *Gingles* prerequisites.

Rather, the Plaintiffs themselves have advocated conflicting positions on the question of racially polarized voting. Georgia maintains the majority vote requirement only for primary elections. To succeed on the first *Gingles* prerequisite, the Plaintiffs must demonstrate that if an alternative system such as a pure plurality were in place, more black candidates would in fact be elected to office. This, however, would require proof of substantial white crossover voting in general elections which is very difficult to achieve in conjunction with a showing, required by the second and third *Gingles* prerequisites, that voting is so racially polarized that the white majority, voting as a bloc, has the ability to defeat the minority's preferred candidates. In an effort to walk that fine line, the Plaintiffs point to the fact that there was "a minimal level of" white crossover voting, to the success of some black candidates in runoffs in majority white jurisdictions, and to the testimony of former Atlanta mayor Maynard Jackson. (Plaintiffs' brief at 36). Jackson testified that

19

in his opinion, if a black candidate could win the primary, he or she would gain the support of the Democratic party, obtaining an advantage in the general election. (R., vol 13, 79-80.) The district court did not consider this evidence sufficient proof of Plaintiffs' theory that those black candidates who are only capable of winning a primary under a pure plurality system would in fact go on to defeat their opponents in the general election.

Overall, the district court concluded that under the totality of the evidence presented by the parties, Georgia's majority vote requirement does not "eviscerate[ ] the ability of minority voters to elect their candidates of choice." (R., vol. 12, Tab 165, 24 (citing *Nipper,* 39 F.3d at 1512)). Detecting no errors of law in the district court's analysis, we affirm under the clearly erroneous standard the district court's ultimate finding that the majority vote law does not yield racially discriminatory results. *See Gingles,* 478 U.S. at 79, 106 S.Ct. 2752 (stating that clearly erroneous standard applies to ultimate finding of vote dilution).

B. *Constitutional Claims*

To make out a constitutional claim against the majority vote requirement, which is racially neutral on its face, Plaintiffs must demonstrate that the provision was motivated by a discriminatory purpose under the analysis used by the Supreme Court in*Hunter v. Underwood,* 471 U.S. 222, 225, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). The Court in *Hunter* held that the test set out in *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) applies to the determination of whether voting statutes are unconstitutional because of a discriminatory purpose. *Hunter,* 471 U.S. at 232, 105 S.Ct. 1916. Under this test, a court must first determine whether the discriminatory motive was a "substantial factor" or a "motivating factor" behind a governmental decision. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568. "Once racial discrimination is shown to have

20

been a "substantial' or "motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter,* 471 U.S. at 228, 105 S.Ct. 1916 (quoting *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568).

The district court found that discrimination was not a substantial or motivating factor behind enactment of the majority vote provision. As previously discussed in our factual analysis, we conclude that this finding is not clearly erroneous. The district court explained that although it was evident that "the virus of race-consciousness was in the air," Plaintiffs failed to prove that "the specific measure at issue here-the majority vote requirement in the 1964 election code-was infected thusly." (R., vol. 12, Tab 165, 26).

The court went on to state that even if the Plaintiffs had proven that race-conscious reasons were a substantial or motivating factor behind the challenged law, Defendants have shown that it would have been enacted even in the absence of those reasons. We agree that the Defendants demonstrated that the supporters of the 1964 majority vote provisions had ample "good government" reasons and that the law would have been passed in the absence of any discriminatory motive. Plaintiffs argue that the district court placed too much emphasis on the motivations of Governor Sanders and his administration, in light of the fact that the entire Georgia legislature enacted the code which contained the majority vote provision. However, the Defendants' evidence persuaded the district court that Sanders wielded enough power in the legislature not only to install one of his friends and allies as Speaker of the House, but also to effectuate the passage of the 1964 election code. The Defendants proved that legitimate "good government" reasons were the primary motivating factor behind the majority vote provision's key proponents, including Sanders, and that the Sanders administration had sufficient power over the legislature to have the 1964 election code

21

enacted. Even if some of the legislators who eventually voted the 1964 code into law had discriminatory reasons for their support, the Plaintiffs' constitutional claims fail under the "but for" test set out in *Hunter* and *Mt. Healthy.*

Plaintiffs critique the district court's fact finding on the question of discriminatory purpose, citing *Arlington Heights* for the proposition that the district court erred in relying heavily on the testimony of decision makers involved in the passage of the majority vote provision. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (stating that in "extraordinary instances the members [of a decision making body] might be called to the stand at trial to testify concerning the purpose of the official action"); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (expressing concern that after-the-fact reconstructions of legislative purpose can be self-serving and unreliable and cautioning that such recollections should be viewed critically). Plaintiffs contend that the district court should have placed more emphasis on the contemporaneous record relating to the legislation. *See Hunter,* 471 U.S. at 228-29, 105 S.Ct. 1916; *Overton Park,* 401 U.S. at 420, 91 S.Ct. 814.

While the Plaintiffs are correct that the contemporaneous record should factor heavily into a trial court's determination of legislative purpose, the district court did in fact consider evidence of the legislative history of the 1964 majority vote provision. To the extent the Plaintiffs contend that newspaper evidence is part of the contemporaneous record and should, therefore, be the primary source for ascertaining legislative intent, we reject this theory. News articles often contain multiple layers of hearsay and do not trump the sworn testimony of eyewitnesses. In ascertaining legislative purpose, a trial court operates under the same rules of evidence that control in any case. The

22

*Arlington Heights* Court explained that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. 555. In our view, the district court's review of the available evidence constituted the "sensitive inquiry" required by *Arlington Heights.* The court analyzed the history of the 1964 majority vote provision and considered the ELSC reports, specifically acknowledging that relevant considerations of discriminatory purpose "include the historical background of the challenged act, the "specific sequence of events' leading up to the act's passage, and the legislative history of the act, "especially where there are contemporaneous statements by members of the decisionmaking body, minutes of its meeting, or reports' " (R. vol. 12, Tab 165, 25 (quoting *Arlington Heights,* 429 U.S. at 266-68, 97 S.Ct. 555)).

Although Plaintiffs offered evidence of racially discriminatory intent from the first two ELSCs appointed by Governor Sanders' predecessors, this evidence did not address why the 1964 code's majority vote provision was passed. The evidence included the unpurged records of the ELSC that proposed the 1964 code, (R. vol. 9, Tab 151, 2), and the Plaintiffs' own expert admitted on the stand that nothing in these records provides a clear link between race and the majority vote provision. (R., vol.14, p. 187). There was evidence of explicit racial considerations on other issues in the third ELSC's records, as well as in the records of the previous ELSC's. However, the clear historical trail of racial purpose on other issues and in previous committees stands in stark contrast with the *absence* of evidence of racial purpose in connection with the majority vote proposal in the third ELSC's records. This contrast supports the district court's finding that the challenged provision was not racially motivated.

Because we affirm the district court's finding that race was not a substantial purpose behind the majority vote law, we need not address the Plaintiffs' contention that even if the racial impact of the majority vote provision is insignificant, it can be invalidated as unconstitutional and in violation of § 2 of the Voting Rights Act if race was a predominant purpose behind its adoption.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.