**Joseph LOWERY, et al., Plaintiffs,**

v.

**Nathan DEAL, in his official capacity as Governor of the State of Georgia, Defendant.**

**Civil Action No. 1:11–cv–974–TCB.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 16, 2012.

---

Jerome D. Lee, Taylor Lee & Associates, LLC, Norcross, GA, for Plaintiffs.

Stefan Ernst Ritter, Office of State Attorney General, Atlanta, GA, for Defendant.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

Before the Court is Defendant's motion to dismiss [5].

### I. Background

In this action, Plaintiffs challenge the State of Georgia's creation of several municipalities in Fulton and DeKalb counties from 2005 to 2008, as well as the proposed

creation of Milton County from territory that currently lies within Fulton County. The municipalities at issue and their years of incorporation are the City of Sandy Springs (2005), the City of Milton (2006), the City of Johns Creek (2006), the City of Chattahoochee Hills (2007), and the City of Dunwoody (2008).

Plaintiffs include seven individuals who are black and/or of African descent and registered voters in Fulton County or De-Kalb County. All but two of the individual Plaintiffs are also registered voters in one of the challenged municipalities. The sole non-individual Plaintiff is the Georgia Legislative Black Caucus ("GLBC"), an association of elected officials from the state of Georgia who are black and/or of African descent. All Plaintiffs claim that the creation of the municipalities unlawfully diluted their voting rights and that the creation of Milton County would do the same.

According to the 2000 U.S. Census, the population of Fulton County was 48.1% white and 44.6% black. In 2005, the population of Fulton County was 45.3% white and 44.1% black. In contrast, the newly created municipalities within Fulton County are predominantly white: the City of Sandy Springs is 78% white and 12% black; the City of Milton is 88.6% white and 4.6% black; the City of Johns Creek is 89.5% white and 4.1% black; and the City of Chattahoochee Hills is 80.9% white and 18% black.

According to the 2000 U.S. Census, the population of DeKalb County was 35.8% white and 54.2% black. In contrast, the City of Dunwoody is 85% white and 4.4% black.

Black voters in Fulton and DeKalb counties have demonstrated a cohesive political identity by consistently supporting black candidates. For example, in both Fulton and DeKalb counties, at least half of the county commissioners are black. Similarly, white voters in the new munici-palities have tended to vote along racial lines, as the overwhelming majority of elected officials in each of the challenged municipalities are white.

Plaintiffs contend that counties and municipalities are mutually exclusive political subdivisions with respect to the provision of local government services, in that the Georgia Constitution prevents them from providing overlapping services. Thus, Plaintiffs argue that by carving majority-white municipalities out of majority-black counties, the State of Georgia diluted minority voting power with respect to the services that are provided by those municipalities.

Plaintiffs further contend that the manner in which the municipalities were created is suspect. Specifically, they allege that the State (1) repealed at least two laws that would have made it more difficult, if not impossible, to create the municipalities; (2) designated the legislation creating the municipalities "state" instead of "local" legislation, thus preventing GLBC members from voting on it before it was presented to the entire legislative body; and (3) prohibited the majority of black voters in Fulton and DeKalb counties from voting on the creation of the municipalities by allowing only the putative residents of the municipalities to vote on their creation.

On March 28, 2011, Plaintiffs filed this action against Defendant Nathan Deal in his official capacity as Governor of the State of Georgia. They claim that the creation of the municipalities diluted their voting rights in violation of the Voting Rights Act of 1965 ("VRA") and the Fourteenth and Fifteenth Amendments. They request (1) that the municipal charters be declared null and void; (2) that the State be enjoined from committing other acts to dilute their voting rights, such as creating Milton County; and (3) an award of their attorneys' fees and costs.

On June 10, 2011, Deal filed a motion to dismiss, arguing that (1) Plaintiffs have failed to state a claim upon which relief can be granted; (2) he is not the proper defendant; and (3) Plaintiffs' claims are barred by the equitable defense of laches. Plaintiffs filed a timely response to Deal's motion, but Deal chose not to file a reply. On January 6, 2012, in light of the important issues raised in this case and the need for further briefing, the Court ordered Deal to file a reply, which he did. Then, on February 23, the Court ordered Plaintiffs to file a surreply addressing Deal's argument that Plaintiffs had failed to postulate a reasonable alternative practice that could be used as a benchmark against which to measure vote dilution. The issues have now been fully briefed and are ready for the Court's consideration.

## II. Discussion

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has explained this standard as follows:

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.[1]

In considering a defendant's motion to dismiss under Rule 12(b)(6), the allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff. *Powell v. Thomas,* 643 F.3d 1300, 1302 (11th Cir.2011). But the court need not accept the plaintiff's legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. *Iqbal,* 129 S.Ct. at 1949–50. Thus, evaluation of a motion to dismiss requires two steps: (1) eliminate any allegations in the complaint that are merely legal conclusions, and (2) where there are well-pleaded factual allegations, "assume their veracity and ... determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.

### B. Causes of Action for Vote Dilution

Plaintiffs challenge the creation of the municipalities under § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973(a); the Fourteenth Amendment's Equal Protection Clause; and the Fifteenth Amendment. In their response brief, they characterize all of their claims as "vote dilution" claims, and they contend that the analysis of a vote-dilution claim will be identical under any of the aforementioned provisions, except that the Fourteenth and Fifteenth Amendments require a showing of discriminatory intent,

---

**1.** In *Randall v. Scott,* 610 F.3d 701, 708 n. 2 (11th Cir.2010), the Eleventh Circuit overturned the heightened pleading requirement it previously applied to § 1983 claims, replacing it with the *Twombly–Iqbal* plausibility standard. Therefore, that standard is applicable to all of Plaintiffs' claims.

whereas the Voting Rights Act does not. The Court will first consider whether this general characterization of the law is correct before moving on to the particulars of Plaintiffs' claims.

The Supreme Court first considered the current version of § 2 of the Voting Rights Act in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). There, the Court examined the legislative history of the 1982 amendment to the Act and noted that Congress explicitly rejected any requirement that a plaintiff bringing a § 2 claim show that the challenged electoral practice or mechanism was adopted or maintained for a discriminatory purpose. The Court then concluded that after the 1982 amendment, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. 2752. Ultimately, the Court held that the dilution of minority voting rights, such as may be accomplished through the use of multi-member voting districts, can offend this principle and give rise to a cause of action under § 2.

 Like § 2 of the Voting Rights Act, the Fourteenth Amendment's Equal Protection Clause creates a cause of action for racially discriminatory vote dilution. *See Shaw v. Reno,* 509 U.S. 630, 640–41, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Unlike § 2, however, the Equal Protection Clause requires a showing of discriminatory intent. *Osburn v. Cox,* 369 F.3d 1283, 1288 (11th Cir.2004). Thus, the Court agrees with Plaintiffs' assertion that the primary difference between vote-dilution claims brought under § 2 and similar claims brought under the Equal Protection Clause is that the Equal Protection Clause requires a showing of discriminatory intent, while § 2 does not. The Court further agrees with Plaintiffs that the requirements to establish that vote dilution has occurred (separate from any discriminatory intent) are the same under both provisions. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs,* 204 F.3d 1335, 1344 (11th Cir.2000) ("[W]e doubt that any plaintiff . . . can establish a constitutional vote dilution claim where his section 2 claim has failed.").

 The Court's only disagreement with Plaintiffs' general description of the law of vote dilution relates to the Fifteenth Amendment. Contrary to Plaintiffs' assertions, neither the Supreme Court nor the Eleventh Circuit currently recognizes vote dilution as a cognizable claim under the Fifteenth Amendment. *Osburn,* 369 F.3d at 1288 (citing *Reno v. Bossier Parish Sch. Bd. (Bossier Parish II),* 528 U.S. 320, 334 n. 3, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000)). As a result, Plaintiffs' Fifteenth Amendment claim will be dismissed.

In sum, § 2 of the Voting Rights Act and the Fourteenth Amendment's Equal Protection Clause each create a cause of action for vote dilution, but the Fifteenth Amendment does not. Consequently, Plaintiffs' Fifteenth Amendment claim will be dismissed. The Court's analysis of Plaintiffs' remaining two claims will be indistinguishable, except that the Equal Protection Clause requires a showing of discriminatory intent, while § 2 does not. Thus, the Court will first determine whether Plaintiffs have stated a claim for vote dilution under § 2. If so, the Court will consider whether Plaintiffs have sufficiently alleged discriminatory intent to state a claim under the Equal Protection Clause.

## C. Vote Dilution and Redistricting

As a final threshold matter, the parties have expended considerable time arguing whether the incorporation of the challenged municipalities was an act of "redis-

tricting" such that it may give rise to a vote-dilution claim. The Court finds the answer to that question to be both straightforward and inconsequential.

■ First, while the term "redistricting" has been used loosely in many opinions, it cannot accurately be applied to the facts of this case. The challenged municipalities, like the unincorporated portions of the counties in which they are located, are not properly considered voting "districts" because they do not define a subset of a larger electorate, nor do they have distinct representation in a larger governmental body.[2] *See* BLACK'S LAW DICTIONARY 544 (9th ed.2009) (defining an "election district" as "[a] subdivision of a state, county, or city that is established to facilitate an election or to elect governmental representatives for that subdivision"). Therefore, the creation of those municipalities is not properly considered an act of "redistricting."

■ This conclusion is of little consequence, however, because redistricting is not the exclusive means of diluting minority voting rights. *See Johnson v. De Grandy,* 512 U.S. 997, 1018–19, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (dilution can be accomplished through "at-large elections, runoff requirements, anti-single-shot devices, gerrymandering, the impeachment of office-holders, the annexation or deannexation of territory, and the creation or elimination of elective offices"). The viability of Plaintiffs' claims depends not on whether redistricting was involved, but on whether the incorporation of the challenged municipalities unlawfully diluted their voting rights. It is to that question that the Court now turns.

## D. Vote Dilution Under the Voting Rights Act

Section 2 of the Voting Rights Act, as amended, provides that no "standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). A violation of § 2 is established "if, based on the totality of circumstances, it is shown that ... [members of the minority group] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 1973(b).

■ As discussed above, § 2 creates a cause of action for vote dilution. In *Gingles,* the Supreme Court considered a challenge to a multimember districting scheme under § 2. In that context, the Court set forth three preconditions to establishing vote dilution: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority group must vote "sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." 478 U.S. at 50–51, 106 S.Ct. 2752. Once these preconditions are established, "the court considers whether, 'on the totality of circumstances,' minorities have been denied an 'equal opportunity' to 'participate in the political process and to elect representatives of their choice.'" *Abrams v. Johnson,* 521 U.S. 74, 91, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (quoting 42 U.S.C. § 1973(b)).

**2.** Of course, municipal boundaries may be taken into account in the creation of state or county voting districts, but Plaintiffs do not allege that the municipalities at issue in this case determine any such districts.

"[A]long with determining whether the *Gingles* preconditions are met and whether the totality of the circumstances supports a finding of liability, a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice." *Holder v. Hall,* 512 U.S. 874, 880, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (plurality opinion). "Put simply, in order to decide whether an electoral system has made it harder for minority voters to elect the candidates they prefer, a court must have an idea in mind of how hard it 'should' be for minority voters to elect their preferred candidates under an acceptable system." *Gingles,* 478 U.S. at 88, 106 S.Ct. 2752 (O'Connor, J., concurring in the judgment).

To summarize, a plaintiff seeking to bring a vote-dilution claim under § 2 must (1) establish the three *Gingles* preconditions; (2) "demonstrate that the totality of the circumstances supports a finding that the voting scheme is dilutive"; and (3) "postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Reno v. Bossier Parish Sch. Bd. (Bossier Parish I),* 520 U.S. 471, 479–80, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997).

Before applying these requirements to the facts of this case, it is helpful to expound on the first *Gingles* precondition and its relationship to the benchmark requirement. The first *Gingles* precondition requires that the minority group be "sufficiently large and geographically compact to constitute a majority in a single-member district." As discussed above, *Gingles* dealt with a challenge to a multi-member districting scheme, and this precondition was formulated in a context-specific manner. However, the Supreme Court has noted that the *Gingles* preconditions "cannot be applied mechanically and without regard for the nature of the claim." *Voinovich v. Quilter,* 507 U.S. 146, 158, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). Thus, the first precondition may be modified for other types of vote-dilution claims. *See De Grandy,* 512 U.S. at 1008, 114 S.Ct. 2647 ("When applied to a claim that *single-member districts* dilute minority votes, the first *Gingles* condition requires the possibility of creating *more than the existing number* of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." (Emphasis added.)).

The essence of the first *Gingles* precondition is that "[u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Bartlett v. Strickland,* 556 U.S. 1, 15, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (quoting *Gingles,* 478 U.S. at 50, 106 S.Ct. 2752). Thus, it is closely related to the benchmark requirement, which asks "how hard it 'should' be for minority voters to elect their preferred candidates under an acceptable system." *Gingles,* 478 U.S. at 88, 106 S.Ct. 2752 (O'Connor, J., concurring in the judgment).

Indeed, the minority group's voting potential for purposes of the first *Gingles* precondition is determined by examining the benchmark practice. *See Brooks v. Miller,* 158 F.3d 1230, 1239 (11th Cir.1998) ("If the plaintiffs in a § 2 case cannot show the existence of an adequate alternative electoral system under which the minority group's rights will be protected, then the case ends on the first prerequisite."). The Eleventh Circuit has described the application of these requirements as essentially asking "whether the court can fashion a remedy for a demonstrated abridgement." *Id.* (quoting *Nipper v. Smith,* 39 F.3d 1494, 1511 (11th Cir.1994)).

In applying these principles to the circumstances of this case, the Court must ask whether Plaintiffs would have the potential to elect their preferred local officials under a reasonable alternative system of local government. Thus, the Court will first determine whether Plaintiffs have postulated a reasonable alternative system of local government that can be used as a benchmark, undiluted voting practice. If so, the Court will determine whether that benchmark satisfies the first *Gingles* precondition, i.e., whether Plaintiffs would have the potential to elect their preferred local officials under the benchmark system. Then, if necessary, the Court will move on to the other *Gingles* requirements and the totality-of-the-circumstances test.

### E. The Benchmark Requirement

The State argues that the benchmark requirement cannot be met in this case "because the municipalities never before existed." Plaintiffs contend that "the benchmark set forth in the Complaint compares the prior voting efficacy of a minority voter at the county level to the current voting efficacy of the same minority voter in [one of the challenged municipalities]." Thus, while they disagree about the particulars, both sides suggest that the appropriate benchmark under § 2 is the State's prior practice. While this may be true in some cases, it is not necessarily so. In order to understand why, a brief discussion of the relationship between § 2 and § 5 of the Voting Rights Act is necessary.

### 1. Sections 2 and 5 Compared

Section 5 "requires covered jurisdictions to obtain either administrative preclearance by the Attorney General or approval from the United States District Court for the District of Columbia for any change in a 'standard, practice, or procedure with respect to voting,' and requires that the proposed change 'not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color.'" *Abrams,* 521 U.S. at 95, 117 S.Ct. 1925 (quoting 42 U.S.C. § 1973c).

Thus, § 5 "applies only in certain jurisdictions specified by Congress and 'only to proposed changes in voting procedures.'" *Holder,* 512 U.S. at 883, 114 S.Ct. 2581 (quoting *Beer v. United States,* 425 U.S. 130, 138, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976)). Its purpose is "to insure that no voting-procedure changes [will] be made that [will] lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Id.* (quoting *Beer,* 425 U.S. at 141, 96 S.Ct. 1357). Consequently, § 5 "by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan." *Georgia v. Ashcroft,* 539 U.S. 461, 478, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003) (quoting *Bossier Parish I,* 520 U.S. at 478, 117 S.Ct. 1491).

In contrast, " § 2 bars *all* States and their political subdivisions from *maintaining* any voting 'standard, practice, or procedure' that 'results in a denial or abridgement of the right ... to vote on account of race or color.'" *Bossier Parish I,* 520 U.S. at 479, 117 S.Ct. 1491 (quoting 42 U.S.C. § 1973(a)) (second emphasis added). Section 2 is concerned not with retrogression, but with vote dilution as compared to a hypothetical, undiluted plan. *Id.* at 480, 117 S.Ct. 1491. "Unlike in § 5 cases, therefore, a benchmark does not exist by definition in § 2 dilution cases." *Holder,* 512 U.S. at 884, 114 S.Ct. 2581. Instead, a court must look for "a reasonable alternative practice" to use as a benchmark. *Id.* at 880, 114 S.Ct. 2581. And in some cases, "there in fact may be no appropriate benchmark ... under § 2." *Id.* at 884, 114 S.Ct. 2581.

"While some parts of the § 2 analysis may overlap with the § 5 inquiry, the two sections 'differ in structure, purpose, and application.'" *Georgia v. Ashcroft,* 539 U.S.

at 478, 123 S.Ct. 2498 (quoting *Holder*, 512 U.S. at 883, 114 S.Ct. 2581). The Supreme Court has "consistently understood these sections to combat different evils and, accordingly, to impose very different duties upon the States." *Bossier Parish I*, 520 U.S. at 477, 117 S.Ct. 1491.

■ In light of these differences, the State's position that § 2's benchmark requirement cannot be met in this case "because the municipalities never before existed" is untenable. The fact that there may have been no relevant prior practice does not preclude the finding of an appropriate benchmark under § 2, because § 2 permits, indeed requires, comparison with a hypothetical, undiluted practice.

■ These differences also prevent the Court from automatically accepting a prior practice as the appropriate benchmark under § 2. Again, § 2 is concerned with dilution, not retrogression. A violation of § 2 cannot be established "merely by showing that a challenged [voting practice] involved a retrogressive effect on the political strength of a minority group." *Holder*, 512 U.S. at 884, 114 S.Ct. 2581 (quoting S. REP. No. 97–417, at 68 n. 224 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 246 n. 224). Therefore, a prior practice is not necessarily the appropriate benchmark under § 2.

Plaintiffs argue that their proposed benchmark is appropriate because "the goal of a Section 2 vote dilution analysis is to evaluate a proposed 'change' to any 'standard, practice, or procedure' that affects voting, and to determine if it denies minority voters equal access to participation in the electoral process." This

statement obviously conflates § 2 with § 5. The Court cannot, as Plaintiffs suggest, automatically accept the prior practice as the appropriate benchmark under § 2.

However, this does not mean that the prior practice cannot be used as a benchmark under § 2. Instead, it means that the Court must determine whether the prior practice is a "reasonable alternative" such that it may serve as an appropriate benchmark under § 2.

**2. Plaintiffs' Proposed Benchmark**

By proposing that the prior system is an appropriate benchmark, Plaintiffs necessarily contend that the alternative practice the State should have followed was to refrain from creating the challenged municipalities. Thus, their position effectively is that the State cannot create a majority-white municipality within a majority-black county, such as Fulton or DeKalb.[3] The question the Court must answer is whether this is a reasonable alternative practice.

■ When determining whether a proposed benchmark is a reasonable alternative practice, "a state's interest in maintaining the challenged system is a legitimate factor to be considered." *S. Christian Leadership Conference of Ala. v. Sessions*, 56 F.3d 1281, 1294 (11th Cir. 1995). Here, it is important to recognize that states have traditionally been given "extraordinarily wide latitude ... in creating various types of political subdivisions and conferring authority upon them." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 71, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). Moreover, "[n]othing in the Voting Rights Act suggests an intent on the part of Congress to permit

---

**3.** Actually, Plaintiffs allege that Fulton County is only 44.1% black, which calls into doubt Plaintiffs' ability to satisfy the first *Gingles* precondition with respect to that county. *See Bartlett*, 556 U.S. at 19–20, 129 S.Ct. 1231 ("[A] party asserting § 2 liability must show by a preponderance of the evidence that the

minority population in the potential election district is greater than 50 percent."). But for purposes of this analysis, the Court will assume that it is at least plausible that the *voting-age* population of Fulton County is more than 50% black.

the federal judiciary to force on the states a new model of government." *Dillard v. Baldwin Cnty. Comm'rs,* 376 F.3d 1260, 1268 (11th Cir.2004) (quoting *Nipper,* 39 F.3d at 1531). Thus, in looking for a benchmark, the Court must work "within the confines of the state's system of government." *Nipper,* 39 F.3d at 1533.

■■■ In Georgia, municipalities are an integral part of the State's system of government. *See* GA. CONST. art. IX. If the Court were to adopt Plaintiffs' proposed benchmark, it would effectively prohibit the State from creating a municipality in any area that is predominantly white but is located within a majority-black county.[4] Thus, the Court would be forcing the State to use only counties as a form of local government in those areas. This cannot be considered working within the confines of the State's system of government; therefore, it is impermissible. Plaintiffs' proposed benchmark is not a reasonable alternative practice under § 2.

### 3. Other Possible Benchmarks

Plaintiffs could have set forth an alternative practice that would have been within the confines of the State's system of government. For example, they might have alleged that the municipalities could have reasonably been created such that black voters would have constituted a majority, i.e., that the boundaries of the municipalities were gerrymandered to exclude black voters. But the complaint is devoid of any such allegations. Indeed, it says nothing about the boundaries of the challenged municipalities or the racial composition of the *unincorporated* areas of Fulton and DeKalb counties. The Court can only speculate as to whether it would have been feasible to create municipalities in those counties with greater minority populations

than the ones challenged here. As a result, the Court has no basis for considering any other potential benchmarks under § 2.

### III. Conclusion

Because Plaintiffs have failed to postulate a reasonable alternative practice that can be used as a benchmark to establish vote dilution, they have failed to state a claim for vote dilution under either the Voting Rights Act or the Fourteenth Amendment's Equal Protection Clause. Moreover, vote dilution is not a cognizable claim under Fifteenth Amendment. Thus, Plaintiffs have failed to state any claims upon which relief can be granted, and the Court need not reach the remaining arguments in Defendant's motion to dismiss.

Defendant's motion to dismiss [5] is GRANTED, and all of Plaintiffs' claims are DISMISSED. The Clerk is DIRECTED to close the case.

---

4. Plaintiffs allege that "Fulton and DeKalb counties are racially polarized geographically, with distinct blocks of minority and white populations being geographically clustered in each county." Compl. ¶ 52.